UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

DAVID L. JAMERSON #138940,          )
                                    )
                    Plaintiff,      )          Case No. 2:08-cv-284
                                    )
v.                                  )          HON. ROBERT HOLMES BELL
                                    )
PATRICIA L. CARUSO, et al.,         )
                                    )          **OPINION**
                    Defendants.     )
_____)

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983.
The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation
Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any
prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a
claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such
relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro
se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's
allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504
U.S. 25, 33 (1992). Applying these standards, the Court will dismiss all of Plaintiff's claims except
for his equal protection claims against Defendants Stasewich, Phillipson, and Taylor.

Plaintiff David L. Jamerson #138940, an inmate at the Marquette Branch Prison (MBP), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Defendants MDOC Director Patricia L. Caruso, Warden David Bergh, Deputy Warden Lloyd Rapelje, Captain Unknown Jones, Lieutenant Unknown Taylor, Resident Unit Manager Denver McBurney, Assistant Resident Unit Supervisor Denise Gerth, Sergeant Robert Nowacki, Sergeant T. Lee, Resident Unit Manager M. Rondeau, Resident Unit Manager A. Dahlstrom, Resident Unit Manager Nancy Phillipson, Resident Unit Manager Unknown Enterline, Corrections Officer Unknown Heidtman, Corrections Officer Unknown Briggs, Corrections Officer Unknown Aleo, Resident Unit Officer Unknown Stasewich, Corrections Officer Unknown Wienberg, Corrections Officer Unknown Koda, Resident Unit Officer Unknown Brennon, Resident Unit Officer Unknown Chartrand, Resident Unit Officer Unknown Bradley, Resident Unit Officer Unknown Betz, Nurse Mary K. Hite, Dr. George Pramstaller, Warden Gerald Hofbauer, Assistant Deputy Warden James Alexander, Assistant Deputy Warden Max Gormley, Assistant Deputy Warden Darlene Edlund, Regional Prison Administrator James MacMeekin, Captain Bill Fleury, Lieutenant Mike Wickstrom, Resident Unit Manager Steve Niemi, Resident Unit Manager Casey Tallio, Assistant Resident Unit Supervisor Mark Pokley, Assistant Resident Unit Supervisor Fred Govern, Sergeant Unknown Lacy, Sergeant Unknown Burnette, Resident Unit Officer Unknown Mackala, Resident Unit Officer Unknown Corkin, Corrections Officer J. Stone, Resident Unit Officer T. Ninnis, Resident Unit Officer Doug Kennin, Resident Unit Officer Rick Majurin, Resident Unit Officer Jeff Marshall, Resident Unit Officer Garry Roy, Unknown Parties Transportation Officers, Warden Greg McQuiggin, Accountant Cy Fortier, Resident Unit Manager Thomas Perttu, Assistant Resident Unit Supervisor Robert Warr, Assistant Resident Unit Supervisor Unknown Marshall, Grievance Coordinator Unknown Tollefson,

Grievance Coordinator Unknown Raymond, Resident Unit Officer Unknown Miller, Resident Unit Officer Unknown Hoppala, and Resident Unit Officer Unknown Huotha.

In his complaint, Plaintiff alleges that on May 7, 2006, he filed a grievance on Defendant Bergh for retaliating against Plaintiff by ordering a response team to use excessive force on him. Plaintiff states that the team bent his wrist back to the point of breaking and forcefully pulled both his legs out of the food slot up to his knees. Plaintiff states that these actions were unnecessary because he was compliant at the time of the incident. In addition, Plaintiff claims that Defendant Nowacki stood by and watched while Plaintiff was subjected to the excessive force.

On May 7 and 8 of 2006, Plaintiff filed grievances on Defendants Nowacki and Rondeau for denying Plaintiff his dinner tray. Sergeant McDonald responded to the grievance by covering up the misconduct. Plaintiff filed a second grievance on Defendant Rondeau on May 22, 2006, which was improperly rejected as duplicative despite the fact that he was complaining of an entirely separate incident. On June 13, 2006, Defendant Enterline deliberately deprived Plaintiff of his meal. On June 25, 2006, Defendant Heidtman denied Plaintiff the ability to wash his dirty laundry. Plaintiff claims that Defendant Jones conspired with Defendants Bergh and Enterline to cover up the deprivations of Plaintiff's rights. Plaintiff states that he was improperly denied clean and usable blankets, towel, washcloth, sponge and soap.

On June 30, 2006, Plaintiff filed a grievance on Defendant Enterline for shutting his window cover and not making the required visual checks while doing his rounds. Plaintiff's grievance was denied at all three levels by Defendants. Plaintiff, who is black, claims that a number of Defendants have used racially derogatory comments towards him which have never been investigated by supervisors.

On July 5, 2006, Defendant Briggs gave Plaintiff a milk carton that had a hole in it. When Plaintiff requested a new carton, Defendant Briggs ordered him to drink the milk out of the damaged carton. On August 12, 2006, Plaintiff was Defendants Stasewich and Phillipson, who are white, denied Plaintiff his meal trays because Plaintiff "attempted to assist another black prisoner." On September 12, 2006, Plaintiff filed a grievance against Defendants Caruso, Bergh, and Taylor regarding the denial of meal trays. Defendant Taylor responded by stating:

> Lay down nigger cause you're not getting any food to eat today, and be thankful you have water and a mattress to lay down on, your black retarded good for nothing ass don't need no food every day. And if I hear about you crying about some food again, I'll have the emergency squad rush in that cell and kick your black ass you understand coon.

On September 20, 2006, Defendant Weinberg denied Plaintiff the right to wash his dirty laundry. Plaintiff complained to Defendants Gerth and McBurney, to no avail. On September 24, 2006, Defendant Phillipson deprived Plaintiff of his lunch tray, accusing Plaintiff of being naked and masturbating when she attempted to deliver his meal. Plaintiff claims that Defendant Phillipson has a history of denying black prisoners their meals by falsely accusing them of masturbating. On October 22 and 24 of 2006, Plaintiff was deprived of his Detroit Free Press by Defendants Chartrand and Brennan. On October 26, 2006, Plaintiff filed a grievance on Defendant Brennan for the theft of his newspaper and the baseball card that came with it. Plaintiff states that Defendant Gerth covered up the theft on November 14, 2006, when she responded to Plaintiff's grievance.

Plaintiff alleges that on October 28, 2006, he was assaulted by Defendant Bradley after Plaintiff refused to take his lunch tray. Defendant Bradley struck Plaintiff with the food tray, injuring his right thumb. Defendants Lee and Bergh disregarded Plaintiff's request to review video

- 4 -

of the assault. On November 3, 2006, Defendant Briggs deprived Plaintiff of the ability to clean his cell. On November 7, 2006, Plaintiff's request to be placed on the indigent list was denied by Defendant Betz, which deprived Plaintiff of the ability to purchase hygiene supplies. On November 10, 2006, Plaintiff was denied cleaning supplies by Defendant Chartrand. On November 12, 2006, Defendant Brennan refused Plaintiff's request for toilet tissue, sponge, soap, ink pens, grievance forms, and toothpaste.

On November 21, 2006, Defendant Alexander ordered Plaintiff to be placed in a cell where another prisoner had been sprayed with chemical agents less than 24 hours earlier. The cell had not been washed and Plaintiff suffered from a burning sensation on his skin and eyes and difficulty breathing. Plaintiff's request for cleaning supplies was denied. Plaintiff filed a grievance and MDOC employee Bott falsified the step I response, stating that the cell had been cleaned. On November 25, 2006, MDOC employee Hoffman- Praise stole Plaintiff's property consisting of one bowl, thirty-two Vet Magazines, one U.S. News, and approximately one-hundred newspaper articles that were being used as exhibits in law suits. When Plaintiff received the rest of his property, it had been dumped out of the legal envelopes and mixed up. Defendant Wickstrom came to Plaintiff's cell at approximately 10:45 p.m. and told Plaintiff to "get naked" so that they could see his genitals. On November 30, 2006, Defendant Olson denied Plaintiff's request to do his laundry.

On February 21, 2007, while Plaintiff was being taking off-site to see an ophthalmologist the transporting officers poured a cup of milk on him. Plaintiff asked to have the heat turned up in the vehicle and was told to quit his whining or he was going back to the prison. Plaintiff was then denied his appointment with the ophthalmologist. On March 26, 2007, Defendant Niemi denied Plaintiff's request to call State Representative Marsha G. Cheeks as a witness. On

May 23, 2007, Defendant Pokley refused to investigate the loss of Plaintiff's white laundry on third shift.

On October 11, 2007, Plaintiff filed a grievance on Food Service for serving him meat that was raw on the inside. Plaintiff states large amounts of meat and fish are cooked in a pan at one time, so that it is not fully cooked when served. Plaintiff states that on November 7, 2007, he asked Defendants Govern and Tallio why he was being housed in a glass cell, and that falsely stated that it was because Plaintiff was a sexual deviant. Plaintiff claims that it was actually in retaliation for his use of the grievance system. On November 8, 2007, Plaintiff asked Defendants Fleury and Tallio why he was not being housed in the general population, and was told that they would look into the situation.

On January 4, 2008, Plaintiff was transferred to the Baraga Maximum Correctional Facility (AMF) and on January 11, 2008, funds were illegally removed from Plaintiff's prison account. Defendants Perttu, and McQuiggin, and J. Armstrong improperly denied his grievance and the subsequent appeals. On February 9, 2008, Plaintiff filed a grievance on Defendants Miller, Hoppola, Hutha, Warr and Perttu for denying him fingernail clippers. Plaintiff's grievance and the subsequent appeals were denied by Defendants Perttu and McQuiggin, as well as J. Armstrong. On February 25, 2008, Plaintiff filed a grievance on Defendants Caruso, McQuiggin, MacMeekin, Perttu, Tollefson and Raymond for the denial of a legal loan. On March 20, 2008, Plaintiff filed a grievance on Defendants Caruso, McQuiggin, Perttu, and MacMeekin, as well as prison officials Warr, Tussing, Smith, and Tribley, for confining Plaintiff in administrative segregation for fourteen years. Plaintiff claims that his confinement in administrative segregation is in retaliation for his use

of the grievance system. Plaintiff's grievance and subsequent appeals were denied by Defendants Perttu and McQuiggin, and J. Armstrong.

On March 28, 2008, Plaintiff was taken to the hospital to have his eyes treated. However, the Baraga Memorial Hospital did not have an optometrist or ophthalmologist. Plaintiff claims that the corrections officers bribed the nurse not to transport Plaintiff to Marquette General Hospital. Plaintiff filed a grievance regarding this incident, which was denied at each step. On April 1, 2008, Plaintiff filed a grievance on Defendants Caruso, McQuiggin, Perttu, Gajewski, Warr, Hay and Miller for denying him access to a notary, thereby violating his First Amendment rights. This grievance was denied at step I by Defendant Larson, at step II by Defendant Tribley, and at step III by J. Armstrong.

On June 11, 2008, Plaintiff went before the security classification committee and asked Defendant Larson about being released from administrative segregation and was told that he would be released when Plaintiff stopped filing grievances against staff. Defendant Tribley denied Plaintiff's step I grievance on this issue, and Plaintiff's step II and III appeals were denied by Defendant McQuiggin and J. Armstrong.

Plaintiff states that Defendants' conduct violated his rights under the First, Eighth and Fourteenth Amendments. Plaintiff seeks compensatory, punitive and exemplary damages, as well as attorney fees.

A complaint fails to state a claim upon which relief can be granted when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. *Jones v. City of Carlisle*, 3 F.3d 945, 947 (6th Cir. 1993). To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal

Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Plaintiff claims that Defendants' conduct from May 7, 2006, until he filed his complaint, violated his rights under the Eighth Amendment. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

Allegations about temporary inconveniences, e..g, being deprived of a lower bunk, subjected to a flooded cell, deprived of a working toilet, do not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency. *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001). The alleged denial of

the ability to wash his dirty laundry on June 25, 2006, and September 24, 2006, and the denial of cleaning and hygiene supplies on November 3, 7, 10, and 12 of 2006, did not rise to the level of an Eighth Amendment violation. Nor do Plaintiff's claims that he was given a milk carton that had a hole in it and was denied a new carton when he complained on July 5, 2006, that he was denied meal trays on August 12, 2006, and that he was served meat that was raw on the inside on October 11, 2007, violate the Eighth Amendment.

Plaintiff also claims that on November 21, 2006, Defendant Alexander had him placed in a cell in which another prisoner had been sprayed with chemical agents less than 24 hours earlier. Plaintiff claims that the cell had not been cleaned and that he suffered from a burning sensation on his skin and eyes and difficulty breathing, and that his request for cleaning supplies was denied. Plaintiff filed a grievance against Defendants Alexander, Caruso, and Hofbauer complaining of torture, asserting that the water in the cell was turned off for 12 hours, so that Plaintiff could not clean the cell. (*See* docket #1, attachment #5, p. 31.) In the step I response to this grievance, Resident Unit Manager K. Niemisto states:

> While you are correct that chemical agent had been used the day before on a prisoner occupying the cell in question, your contention that the cell was not cleaned and clear of chemical agent is false. [Resident Unit Officer] G. Bott reports and documented that the cell was cleaned and in "move in" condition prior to your entry. There is no evidence to believe otherwise. You have shown no violation of policy or procedure as you claim.

Niemisto also noted that during the interview, Plaintiff became belligerent, insolent and uncooperative. (*See* docket #1, attachment #5, p. 32.) The court concludes that this claim does not rise to the level of an Eighth Amendment violation. Viewing the facts in the light most favorable

to Plaintiff, he was placed in a cell with chemical residue on the walls and suffered transient discomfort as a result.

Plaintiff claims that he was subjected to excessive force on May 7, 2006, and October 28, 2006. The Eighth Amendment prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346. Among unnecessary and wanton infliction of pain are those that are "totally without penological justification." *Id.*

Plaintiff asserts that on May 7, 2006, a "response team" bent his wrist backward to the point of breaking and forcefully pulled both his legs out of the food slot up to his knees pursuant to the orders of Defendant Bergh, despite the fact that Plaintiff was entirely compliant. Plaintiff filed a grievance asserting excessive force on May 8, 2006, which is attached as an exhibit to Plaintiff's complaint. The step I response states:

> Prisoner Jamerson was interviewed as states he was not treated fairly by the Move Team. [Sergeant] Nowacki was interviewed and states prisoner Jamerson had his window covered and was refusing staff orders to come out of his cell so a towel restriction could be imposed. A Move Team was utilized to remove the prisoner and impose the restriction. [Sergeant] Tenuta was the Move Team Supervisor and states the prisoner was not abused in any way. Restraints were placed on the prisoner and the normal escort hold of the hand/wrist were utilized to move him to the shower stall area. When leg irons are utilized the prisoners feet are always held to prevent kicking while they are secured on the prisoner. This respondent finds no wrongdoing by staff in this incident. N

(*See* docket #1, Attachment #4, p. 1.)

A de minimis use of physical force is beyond constitutional recognition, provided that the use of force is not of a sort "repugnant to mankind." *Id*. at 9-10 (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)); *see Norman v. Taylor*, 25 F.3d 1259, 1264 (4th Cir. 1994), *cert. denied* 513

U.S. 1114, 115 S. Ct. 909 (1995) ("absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is de minimis).  Federal courts have routinely held that a single push, shove, punch, or blow by a prison guard does not rise to the level of a constitutional violation.  *Neal v. Miller*, 778 F. Supp. 378, 383-384 (W.D. Mich. 1991) (collecting cases).  The same hold true even when the push or shove appears to be unnecessary.  *Hampton v. Alexander*, No. 95-3457, 1996 WL 40237 (6th Cir. Jan. 31, 1996).  There are no extraordinary or unusual circumstances surrounding the alleged conduct by the move team.  Plaintiff does not allege that he was injured as a result of their actions.  From his allegations, it is plain that any injury was de minimis.  Thus, Plaintiff's allegations regarding the use of force on May 7, 2006, do not rise to the level of a constitutional deprivation.

Plaintiff states that on October 28, 2006, he refused to take his lunch tray.  Plaintiff contends that Defendant Bradley then struck him with his food tray, "injuring" his right thumb.  In response to Plaintiff's step I grievance on this matter, Defendant Lee notes:

> I have interviewed all relevant parties.  It should be noted at this time, the Grievant was on Hunger Strike status on the alleged date of incident. [Resident Unit Officer] Bradley states as he past [sic] the Grievant's cell, the Grievant came to his cell door. [Resident Unit Officer] Bradley said he thought the Grievant would take his tray so he opened the food slot and placed the food tray on the slot. [Resident Unit Officer] Bradley further states, he removed the tray from the slot after it was clear that the Grievant was not going to take it.  Bradley states he did not push the tray in or strike the prisoner with it; he removed the tray and secured the slot.

(*See* docket #1, Attachment #5, p. 14.)

Moreover, Plaintiff does not specify the nature of the alleged injury to his thumb.  Nor does Plaintiff state that he required any medical intervention for his injury.  Every malevolent touch

by a prison guard does not give rise to an Eighth Amendment cause of action, *see Hudson v. McMillian*, 503 U.S. 1, 9 (1992), and the prisoner must allege that he sustained more than de minimis injury in order to state a viable excessive force claim. *See id.* at 9-10; *Thaddeus-X v. Blatter*, 175 F.3d 378, 402 (6th Cir. 1999) (en banc).

Plaintiff claims that he was denied treatment by either an optometrist or ophthalmologist on February 21, 2007, and March 28, 2008. A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*

Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer*, 62 F.3d at 154-55; *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

On February 21, 2007, Plaintiff claims that while he was being transported off-site for an appointment with an ophthalmologist, the transporting officers dumped a cup of milk in Plaintiff's lap. Plaintiff claims that the officers then refused to turn the heat up in the vehicle and Plaintiff's feet and hands were quite cold. Plaintiff complained and was warned to stop whining or he would be returned to the prison. Plaintiff was then taken back to the prison before he could be seen by the ophthalmologist. The step I response to the grievance on this issue states that the

transporting officers determined that Plaintiff was being uncooperative and belligerent toward them. Based on this, the officers concluded that Plaintiff's state of mind warranted them to return to the facility and reschedule the appointment. (*See* docket #1, Attachment #6, p. 14.)

Plaintiff claims that on March 28, 2008, he was taken to the Baraga Memorial Hospital. After being seen by a nurse and learning that no optometrist or ophthalmologist was available, the transporting officers allegedly gave the nurse some money and told her to make sure that they did not have to take Plaintiff to Marquette because it was Friday and they had some drinking to do. The step I response to Plaintiff's grievance on this matter states that Plaintiff was being transported by officers Fegan and Danielson, who denied Plaintiff's allegations. The response further states that R.N. Chosa had been contacted and indicated that Plaintiff was seen by health care staff on his return to the facility and was informed that an appointment would be set up for him to see an optometrist at the facility at a later date. (*See* docket #1, Attachment #7, p. 16.)

The court notes that Plaintiff does not state that he suffered any injuries as a result of the delay in being examined by an optometrist or ophthalmologist. Plaintiff was seen by a registered nurse and was scheduled for an appointment with an optometrist at the facility. The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir.

2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

Finally, Plaintiff claims that his continued placement in administrative segregation for the past 14 years violates the Eighth Amendment. However, because placement in segregation is a routine discomfort that is a part of the penalty that criminal offenders pay for their offenses against society, it is insufficient to support an Eighth Amendment claim. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

Plaintiff also claims that Defendants' conduct violated his First Amendment right to be free from retaliation. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Thaddeus-X*, 175 F.3d at 394. Moreover, Plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The filing of a prison grievance is constitutionally-protected conduct for which a prisoner cannot be retaliated against. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Hall v. Nusholtz*, No. 99-2442, 2000 WL 1679458, at *2 (6th Cir. Nov. 1, 2000); *Burton v. Rowley*, No. 00-1144, 2000 WL 1679463, at *2 (6th Cir. Nov. 1, 2000). The adverseness inquiry is an

objective one, and does not depend on how a particular plaintiff reacted. The relevant question is whether the defendants' conduct is "*capable* of deterring a person of ordinary firmness;" the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002).

Plaintiff claims that on May 7, 2006, Defendant Bergh retaliated against him for filing grievances by ordering the move team to use excessive force on Plaintiff. However, as noted above, the asserted force was de minimis and does not appear to have resulted in any actual injuries to Plaintiff. For the same reasons, the court concludes that this conduct was not sufficiently adverse to deter a person of ordinary firmness from filing grievances. Moreover, it is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (C.D. Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. Conclusory allegations of retaliatory motive "with no concrete, relevant particulars" fail to raise a genuine issue of fact for trial. *Salstrom v. Sumner*, No. 91-15689, 1992 WL 72881, at *1 (9th Cir. Apr. 10, 1992); *see also Birdo v. Lewis*, No. 95-5693, 1996 WL 132148, at *1 (6th Cir. Mar. 21, 1996); *Fields v. Powell*, No. 94-1674, 1995 WL 35628, at *2 (6th Cir. Jan. 30, 1995); *Williams v. Bates*, No. 93-2045, 1994 WL 677670, at *3 (6th Cir. Dec. 2, 1994). Plaintiff merely alleges the ultimate fact of retaliation with regard to Defendant Bergh. He has not presented any facts to support his conclusion that Defendant Bergh ordered the move team to use excessive force because of his use of the grievance system. Accordingly, his speculative allegation fails to state a claim.

In addition, Plaintiff claims that in November of 2007, he was being housed in a glass cell in retaliation for his use of the grievance system. However, the reason Plaintiff was given for

his placement was that he was a "sexual deviant." Because Plaintiff merely alleges the ultimate fact of retaliation with regard to this claim, it is properly dismissed as speculative and conclusory.

Plaintiff asserts that on June 11, 2008, he went before the security classification committee and asked Defendant Larson about being released from administrative segregation. Plaintiff states that he was told that he would be released when he stopped filing grievances on staff. The step I response indicates that staff had serious issues with Plaintiff's ability to get along with others. The step I respondent, Linda Tribley, stated that Plaintiff was read some of his monthly reviews, to which Plaintiff responded that he was Black and had the wrong shoe size. The step III response to Plaintiff's grievance on this issue states:

> The Step Two respondent states the Step One responder provided a statement in support of the fact that grievances have nothing to do with the Grievant's continuance in segregation. Unit staff has documented poor behavior on the part of the Grievant and there are concerns regarding his ability to behave in general population. The Grievant did not provide additional information to support his claim. The responder stated he is currently appropriately housed in Level V administrative segregation in accordance with R791.4401.

(*See* docket #1, attachment #7, pp. 25, 27.) The court concludes that, as with Plaintiff's other assertions of retaliation, it is properly dismissed as speculative and conclusory.

Plaintiff claims that much of Defendants' alleged misconduct was motivated by a desire to discriminate against him on the basis of his race. To establish a violation of the Equal Protection Clause, a prison inmate must prove that a discriminatory intent or purpose against a disfavored class or excluded group was a factor in an action taken by prison officials. *See McCleskey v. Kemp*, 481 U.S. 279 (1987); *Heckler v. Mathews*, 465 U.S. 728 (1984); *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 265 (1977).

Plaintiff, who is black, states that a number of Defendants have used racially derogatory comments towards him that have never been investigated by supervisors. As noted above, Plaintiff also claims that Defendants Stasewich and Phillipson, who are white, denied Plaintiff his meal trays on August 12, 2006, because he attempted to assist another black prisoner. Plaintiff contends that on September 12, 2006, Plaintiff filed a grievance on Defendants Caruso, Bergh, and Taylor regarding the denial of meal trays. Defendant Taylor responded by stating:

> Lay down nigger cause you're not getting any food to eat today, and be thankful you have water and a mattress to lay down on, your black retarded good for nothing ass don't need no food every day. And if I hear about you crying about some food again, I'll have the emergency squad rush in that cell and kick your black ass you understand coon.

Plaintiff also claims that Defendant Phillipson deprived him of his meal tray on September 24, 2006, by falsely accusing Plaintiff of masturbating. Plaintiff claims that Defendant Phillipson has a history of depriving black prisoners of their meal trays.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. CONST., amend. XIV; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). When a law adversely impacts a "suspect class" such as one defined by race, alienage, or national origin, or invades a "fundamental right" such as speech or religious freedom, the rigorous "strict scrutiny" standard governs, whereby such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne*, 473 U.S. at 440. The court concludes that Plaintiff's equal protection claims

against Defendants Stasewich, Phillipson, and Taylor regarding the denial of meal trays may not be dismissed upon initial review for failure to state a claim. However, Defendants Bergh and Caruso were not involved in the denial of Plaintiff's trays and that their only roles in this action involve the denial of administrative grievances or the failure to act. Defendants Bergh and Caruso cannot be liable for such conduct under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999), *cert. denied*, 530 U.S. 1264, 120 S. Ct. 2724 (2000).

Plaintiff also claims that Defendants Chartrand and Brennan violated his due process rights when they stole his newspaper and the baseball card that came with it. Plaintiff also claims that Defendant Gerth covered up the theft when she responded to his grievance. In the step III response to Plaintiff's grievance, J. Armstrong noted that Plaintiff's claim was that when he received his Detroit Free Press on 10-26-06, it did not include a Detroit Tigers baseball card. J. Armstrong further stated:

> The investigator has reviewed the documents presented with the appeal to Step Three. The Step One respondent reported the Grievant refused to participate in the interview process. This does not show a good faith effort on the Grievant's part to work with staff to resolve his concerns. All relevant information was considered. Based on this review, this writer finds the responses provided at Step One and Step Two adequately address the merits of the main issue grieved. The evidence presented does not support the charges made by the Grievant. He did not show a violation of policy. The Step Three appeal is denied.

(*See* docket #1, attachment 5, p. 12.)

Plaintiff's due process claim is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part* by *Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due-

process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984); *Mitchell v. Fankhauser*, 375 F.3d 477, 483-84 (6th Cir. 2004). Because Plaintiff's claim is premised upon allegedly unauthorized negligent acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-480 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not sustained his burden in this case. Plaintiff has not alleged that state post-deprivation remedies are inadequate. Moreover, numerous state post-deprivation remedies are available to him. First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. MICH. DEP'T OF CORR., Policy Directive 04.07.112 ¶ II(B) (effective Sept. 24, 1998). Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board. MICH. COMP. LAWS § 600.6419; Policy Directive, 04.07.112 ¶ II(B). Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies." MICH. COMP. LAWS § 600.6419(1)(a); *see Green v. State Corrections Dep't*, 192 N.W.2d 491 (Mich. 1971) (state liable for tortuous injury sustained by a sentenced convict at the Detroit House of Correction). The Sixth Circuit has specifically held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See Copeland*,

57 F.3d at 480. Plaintiff does not allege any reason why a state-court action would not afford him complete relief for the deprivation, either negligent or intentional, of his personal property. Accordingly, Plaintiff's due process claims against Defendants Chartrand and Brennan will be dismissed.

Plaintiff also claims that on January 11, 2008, following his transfer to the Baraga Maximum Correctional Facility (AMF), funds were illegally removed from his prison account. Plaintiff asserts that his grievances on this matter were improperly denied by Defendants Perttu and McQuiggin, and step III respondent J. Armstrong. In response to Plaintiff's step I grievance on this matter, Defendant Perttu stated:

> Prisoner was interviewed on 1/28/08 at approximately 0930 and prisoner stated, "AMF stole my money from me for no reason and I want it back. They embezzled it from me." [Plaintiff] was interviewed and it was explained to him that when he transferred here to AMF from MBP the $9.40 were funds that had been saved previously for filing fees and were placed in an account with [Plaintiff's] name on it. These funds are used to pay for court filing fees, but they are not sent to the courts until the minimum amount of $10.00 is achieved. Since you did not reach the $10.00 minimum it was transferred from MBP to AMF since this is where you currently lock. Once you achieve the $10.00 minimum it will be sent to the courts in your name. I find no violation of [policy].

(*See* docket #1, attachment 7, p. 1.) The step II and III responses to Plaintiff's grievance support the finding at step I. (*See* docket #1, attachment 7, p. 2-4.)

The court notes that Plaintiff has not alleged that state post-deprivation remedies are inadequate. The Sixth Circuit has found that Michigan law provides "several adequate post-deprivation remedies" to a prisoner asserting improper removal of money from his prison account. *Copeland*, 57 F.3d at 480. In a number of cases similar to this one, the Sixth Circuit has affirmed

dismissal where the inmate failed to allege and show that state law post-deprivation remedies were inadequate. *Id.* at 479-80 (money wrongly removed from prison account); *Lillie v. McGraw*, No. 97-3359, 1997 WL 778050, at *1 (6th Cir. Dec. 12, 1997) (officials allegedly broke television); *Mowatt v. Miller*, No. 92-1204, 1993 WL 27460, at *1 (6th Cir. Feb. 5, 1993) (misapplication of money to a deficit in prison account); *Shabazz v. Lecureux*, No. 85-2014, 1986 WL 16140, at *1 (6th Cir. Dec. 5, 1986) (illegal appropriation of money from prisoner account). Accordingly, the court will dismiss Plaintiff's claims regarding the allegedly improper removal of money from his prison account.

Plaintiff also claims that his confinement in administrative segregation for fourteen years violates his procedural due process rights. The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. According to the *Sandin* Court, a prisoner is entitled to the protections of due process only when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995). The *Sandin* Court concluded that mere placement in administrative segregation did not implicate a liberty interest because the segregation at issue in that case did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005).

In *Wilkinson v. Austin*, 125 S. Ct. 2384, 2394-95 (2005), the Supreme Court applied the rule of *Sandin* to conclude that Ohio's "Supermax" prison facilities imposed a sufficiently

atypical and significant hardship to created a liberty interest implicating due process. In determining what process was due to an inmate faced with placement in the facility, the Court applied the framework established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), requiring consideration of three distinct factors: (1) private interest that will be affected by official action; (2) risk of erroneous deprivation of such interest through procedures used, and probable value, if any, of additional or substitute procedural safeguards; and (3) government's interest, including function involved and fiscal and administrative burdens that additional or substitute procedural requirements would entail. *Wilkinson*, 125 S. Ct. at 2395. The Court concluded that the procedural protections introduced by the state of Ohio since inception of the lawsuit were adequate to satisfy the requirements of due process. *Id.* at 2398.

The court notes that given the length of Plaintiff's confinement in administrative segregation and the conditions associated with this confinement, it appears that such confinement may constitute an atypical and significant hardship. However, even if Plaintiff's incarceration in segregation is deemed to be atypical and significant, the consequence would merely be to entitle him to a periodic due process review of his segregation status.

The step I response to Plaintiff's March 20, 2008, grievance on this matter states:

Prisoner was interviewed on 3/31/08 at approximately 0905 and prisoner stated, "I asked to be released to G.P. and [Acting Assistant Deputy Warden] Smith denied my request. She has no reason to keep me in the hole I have been in the hole for fourteen years now. [Assistant Deputy Warden] T. Smith was interviewed and she stated that she told [Plaintiff] that he was not going to be released today during the monthly interview which was conducted on 3/20/08. It was explained to [Plaintiff] that there are several factors to consider before releasing someone to G.P. Looking at [Plaintiff's] file [Plaintiff has] been in Ad. Seg. Since 9/2/1988 for an (030) Possession of a weapon which was a piece of metal 1 [inch] long and

> sharpened to a point. Sine [sic] being placed in Ad. Seg. [Plaintiff
> has] received 197 misconducts. [Plaintiff is] clearly not a model
> prisoner. With that being said [Plaintiff has] been doing much better
> the past few months. When SCC [the Security Classification
> Committee] determines that [Plaintiff] will honor the trust in a less
> restrictive confinement [Plaintiff] will be considered for G.P.
> placement in accordance with PD 04.05.120.

(*See* docket #1, attachment 7, p. 13.)

In addition, the responses to Plaintiff's June 11, 2008, grievance also indicate that Plaintiff received monthly reviews by the SCC. (*See* docket #1, attachment 7, pp. 25-27.) Applying *Hewitt v. Helms*, 459 U.S. 460 (1983), the court finds that Plaintiff's original placement and continuation in segregation was well-supported and, therefore, met due process standards. Plaintiff does not dispute that he was guilty of possessing a dangerous weapon or that he has been the recipient of numerous misconducts. Given Plaintiff's record, he presented an obvious threat to prison staff. Moreover, it is clear that Plaintiff has received periodic reviews by the SCC. The fact that Plaintiff disagrees with the reasoning and recommendations of the SCC does not render the periodic reviews constitutionally deficient. Accordingly, the court concludes that Plaintiff has received more than adequate procedural due process.

Plaintiff claims that he was improperly denied a postage loan for legal mail to "U.S. law makers" on February 24, 2008. Plaintiff filed a grievance regarding this denial and asserts that this grievance was improperly returned to him without being processed. In the step II response to Plaintiff's grievance regarding the return of his grievance, Defendant McQuiggin notes that grievances are only returned if needed information is not included, or if the prisoner has not properly filled out the form. In such a case, the prisoner may simply add the missing information and return the grievance for processing. (*See* docket #1, attachment 7, p. 11.)

It does not appear as if Plaintiff ever refiled his grievance. At any rate, the court notes that Plaintiff's assertion regarding the denial of a postage loan does not state a viable First Amendment claim. In *Bounds v. Smith*, 430 U.S. 817 (1977), the Supreme Court recognized a prisoner's fundamental right of access to the courts. While the right of access to the courts does not allow a State to prevent an inmate from bringing a grievance to court, it also does not require the State to enable a prisoner to discover grievances or litigate effectively. *Lewis v. Casey*, 518 U.S. 343 (1996). Thus, *Bounds* did not create an abstract, free-standing right to a law library, litigation tools, or legal assistance. *Id.* at 351 (1996). Further, the right may be limited by legitimate penological goals, such as maintaining security and preventing fire or sanitation hazards. *See Acord v. Brown*, No. 91-1865, 1992 WL 58975 (6th Cir. March 26, 1992); *Hadix v. Johnson*, No. 86-1701, 1988 WL 24204 (6th Cir. March 17, 1988); *Wagner v. Rees*, No. 85-5637, 1985 WL 14025 (6th Cir. Nov. 8, 1985).

To state a claim, an inmate must show that any shortcomings in the library, litigation tools, or legal assistance caused actual injury in his pursuit of a legal claim. *Lewis*, 518 U.S. at 351; *Talley-Bey*, 168 F.3d at 886; *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996); *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996); *Walker v. Mintzes*, 771 F.2d 920, 932 (6th Cir. 1985). An inmate must make a specific claim that he was adversely affected or that the litigation was prejudiced. *Vandiver v. Niemi*, No. 94-1642, 1994 WL 677685, at *1 (6th Cir. Dec. 2, 1994). Particularly, an inmate cannot show injury when he still has access to his legal materials by request, *Kensu*, 87 F.3d at 175, when he fails to state how he is unable to replicate the confiscated documents, *Vandiver*, 1994 WL 677685, at *1, or when he could have received the material by complying with the limits on property, e.g., where he had the opportunity to select the items that he wanted to keep in his cell,

or when he had an opportunity to purchase a new footlocker that could hold the property. *Carlton v. Fassbender*, No. 93-1116, 1993 WL 241459, at *2 (6th Cir. July 1, 1993). Plaintiff fails to allege any such injury in this case. Therefore, his access to courts claim is properly dismissed.

Having conducted the review now required by the Prison Litigation Reform Act, the Court determines that all of Plaintiff's claims will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c), except for Plaintiff's equal protection claims against Defendants Stasewich, Phillipson, and Taylor. The Court will serve the complaint against Defendants Stasewich, Phillipson, and Taylor.

An Order consistent with this Opinion will be entered.

Dated: <u>July 13, 2009</u>                    <u>/s/ Robert Holmes Bell</u>
                                                        ROBERT HOLMES BELL
                                                        UNITED STATES DISTRICT JUDGE